---

(No. 11975.—Appellate Court reversed; circuit court affirmed.)
THE AYERS NATIONAL BANK OF JACKSONVILLE *et al.* Plaintiffs in Error, *vs.* WILLIAM BARBER *et al.* Defendants in Error.

*Opinion filed February 20, 1919—Rehearing denied April 2, 1919.*

1. DEBTOR AND CREDITOR—*when creditors are not entitled to equitable relief against wife to whom a debtor has made conveyances.* Creditors filing a bill in aid of executions against a judgment debtor who before judgment made conveyances to his wife with fraudulent intent, cannot obtain equitable relief against the wife where there is no evidence that she participated in the fraudulent intent or had any knowledge of the indebtedness, but the evidence is that she bought the property of her husband to collect the amount he owed her.

2. SAME—*husband may protect wife or relatives as creditors by conveyances.* A husband may deal with his wife in business matters and protect her or his relatives standing as creditors by conveyances in satisfaction of existing indebtedness.

3. SAME—*relationship is not proof of fraud in conveyance defeating creditors.* Relationship is merely a circumstance that may excite suspicion but will not of itself amount to proof of fraud in a conveyance defeating creditors.

4. SAME—*when property is subject to lien of judgments.* Real estate owned by the wife of a judgment debtor and conveyed by her to her husband's brother as part consideration for the conveyance to her of the husband's farm is subject to the liens of judgments against the husband for a pre-existing indebtedness, where the conveyance to the brother was in pursuance of a fraudulent scheme between the brother and the husband to defeat the collection of the claims of the husband's creditors, even though the wife, as grantor, was ignorant of such fraud.

5. FRAUD—*burden is on complainants to establish fraud charged in bill.* Every transaction is presumed to be fair and honest until the contrary is established, and the burden of proof is upon complainants to establish a charge of fraud laid in their bill.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on writ of error to the Circuit Court of Morgan county; the Hon. FRANK W. BURTON, Judge, presiding.

BELLATTI, BELLATTI & MORIARTY, for plaintiffs in error.

HARDIN W. MASTERS, and THOMAS D. MASTERS, for defendants in error.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

On January 26, 1916, the plaintiffs in error, the Ayers National Bank of Jacksonville and Elmer J. Henderson, filed in the circuit court of Morgan county a bill in aid of two executions, in which William Barber, Anna M. Barber, Pearl Frost, James E. Barber, Grace W. Barber, Lizzie Heminghaus and Clara Heminghaus were made defendants. The bill was finally dismissed as to Lizzie and Clara Heminghaus, and as finally amended it charged that the Ayers National Bank of Jacksonville on May 12, 1915, obtained a judgment in the circuit court of Morgan county

against William Barber for $2026.20; that Elmer J. Henderson on May 17, 1915, obtained a judgment in the same court against Barber for $1107.16; that executions were duly issued on said judgments, respectively, May 16, 1915, and May 20, 1915; that prior to the date of said judgments. Barber was the owner of a certain 120 acres of land in said county, described in the bill; that on April 14, 1915, the indebtedness for which said judgments were afterwards entered being in existence, Barber made a pretended conveyance of said land to Pearl Frost, and that Pearl Frost thereafter made a pretended conveyance of said land on the same date to Anna M. Barber, wife of William Barber; that both of said conveyances were without consideration and were mere shams, made to defraud the plaintiffs in error out of their just demands and to prevent the levy of said executions on said land, and that said land is now held by Anna M. Barber in trust for William Barber; that it appears from a certain agreement entered into between William and Anna M. Barber of the same date as the conveyances, that she, in consideration of the conveyance to her of the land, assumed an indebtedness due from William Barber to Lizzie Heminghaus for $2300 and one due from him to Clara Heminghaus for $1080, but that, in fact, no such indebtedness existed; that from the agreement it appears that part of the pretended consideration for the conveyance of said premises to Anna M. Barber was a conveyance of her own property, a certain five-acre lot and building thereon located in Jacksonville, to James E. Barber, brother of William Barber, and Grace W. Barber, wife of James, in pretended extinguishment of a pretended debt of William to James of $4000, but that, in fact, there was no such indebtedness; that by said last conveyance James E. Barber, a man of little or no financial worth, became seized of said house and lot in trust for the use of William Barber; that James E. and Grace W. Barber mortgaged said house and lot to Mary H. and Oliver Hodgson for

$1000; that Anna M. Barber is a woman of little or no pecuniary responsibility; that William Barber has no real estate other than the premises aforesaid held in trust for him, or other property, and refuses to satisfy the executions aforesaid. The prayer of the bill is for relief against the defendants thereto; that the conveyances from William Barber to Pearl Frost, and from Pearl Frost to Anna M. Barber, and from Anna M. and William Barber to James E. and Grace W. Barber, may be set aside and declared null and void as to plaintiffs in error; that James E. and Grace W. Barber be required to turn over to plaintiffs in error the $1000 borrowed from the Hodgsons; that the parties be restrained from disposing of or incumbering any of the premises in question, and that the sheriff be directed to levy the executions issued on said judgments upon the premises conveyed, and that he sell the same as the property of William Barber. There is also a prayer for general relief.

Pearl Frost filed a disclaimer. The other parties to the bill answered the same, denying substantially all the material allegations therein, and alleged that the conveyances were made for full and adequate consideration; that Anna M. Barber obtained good title to the premises conveyed to her, and that she and her husband had a right of homestead therein, and that James E. and Grace W. Barber obtained a good and valid title to the house and lot by reason of said conveyance to them.

The circuit court found that a part of the consideration passing from Anna M. Barber for the conveyance to her of said land was the conveyance she made of the house and lot to James E. and Grace Barber to extinguish a pretended debt owing by William to James for $4000, but that, in fact, there was no such debt; that such conveyance was a sham and a fraud on the part of William and James and an attempt to defraud and hinder plaintiffs in error in the collection of their judgments; that therefore the premises

so conveyed were held by James E. Barber "under a·constructive trust in favor of the said William Barber and subject to the lien of the judgments," and that James E. and Grace W. Barber had mortgaged the same for $1000. The court then decreed that the said property was equitably the property of William Barber and held the same subject to said executions, and that James E. Barber should account for the amount that he received by mortgaging the same, ($1000,) in the event that the lot subject thereto would not satisfy the debts, and that in the event of any surplus above the amount of the executions the same should be paid to James, and in case of any deficit William should pay the same to plaintiffs in error, and that plaintiffs in error should have judgment therefor. The record was reviewed by the Appellate Court for the Third District on writ of error, and that court held that plaintiffs in error were not entitled to any relief and reversed the decree of the circuit court. The case comes to this court on *certiorari.*

The only questions raised on this record and argued are whether or not the conveyances by which Anna M. Barber obtained title to the 120 acres of land and James E. Barber obtained title to the house and lot were made in good faith and for an adequate consideration and without intent to defraud plaintiffs in error.

The evidence in the record clearly discloses that Pearl Frost was not substantially interested in the conveyance of the 120 acres of land but was merely used in the transaction as a means of passing the title of William and Anna M. Barber to the latter. It also discloses that the deeds were made in pursuance of an agreement between William and Anna M. Barber by which William was to sell and convey to her the 120 acres of land and all his personal property, farm implements, stock, etc., for which she agreed to pay him $110 per acre for the land and $600 for all of the personal property, amounting to $13,800. William Barber had, on the day before the deeds were made, obtained

a loan on the land for $6000. With this money he paid off a prior mortgage on the land, amounting to $4801.78; to the Elliott State Bank his note of $453.76, on which his brother, James, was surety; for taxes, $94.75; to James E. Barber for work done by him in 1914, $65; for coal bill for his mother, $128.50; on the amount he owed his wife, Anna M. Barber, $300; and the remainder he used in clearing up the expenses of the loan. The agreed consideration for the conveyance of the land and personal property to Anna M. Barber was the assumption by her of the $6000 incumbrance on the land, the payment by her of two notes of William Barber to Lizzie Heminghaus, amounting to $2300, and another note by him to Clara Heminghaus for $1080, all three notes being also signed by Anna M. Barber as surety; also the cancellation of $600 of the remaining indebtedness of William to Anna M. Barber, and the conveyance by her of the house and lot to James E. Barber, valued at $4000. This left William Barber still indebted to his wife in the sum of $200 according to their calculation, and for that sum he gave her his promissory note. Shortly after the conveyance to her of the land she paid near $2000 on the three Heminghaus notes, and is amply able and stands ready to pay the remainder of said notes.

We have examined the evidence with great care, and our conclusion therefrom is that plaintiffs in error failed to establish by any evidence in the record their right to any equitable relief against Anna M. Barber. While the evidence does prove clearly an intent on the part of William Barber by means of said conveyances to hinder, delay and to defraud the plaintiffs in error in the collection of their judgments, Mrs. Barber was not shown to have participated in that fraudulent intent. The evidence not only failed to show that she had notice of plaintiffs in error's debts against William Barber, but the positive evidence is that she did not have any knowledge thereof whatever, and

that she bought the property of her husband to .collect the amounts he owed her and supposed she was assuming all his debts. The proof shows that William Barber owed her $1100 before he obtained the $6000 loan and paid her therefrom $300. There is no evidence to the contrary. The showing therefore is that she paid an adequate consideration for the land when tested by the testimony of plaintiffs in error's own witnesses, some of whom valued it as low as $100 per acre. Besides, by some error in the calculation of the value of the land she paid $180 more for it than the agreed price of $110 per acre. She conveyed her lot to James E. and Grace W. Barber to pay a supposed debt of William Barber to James E. Barber of $4000, which she was told by both her husband and James E. Barber was a *bona fide* indebtedness, and she had no notice, so far as the record discloses, that said debt was not a real and valid debt in that amount. She had considerable property of her own when she married William Barber, and the proof is ample that she loaned him $1100 before the conveyances were made and paid the same to him out of her own separate property and funds. The only suspicious circumstance in the record is the fact that William Barber executed a note to her for more than $800 of the $1100 that he owed her after this suit was brought and dated the note back to a date previous to their contract to make the deeds in question. She is not connected by the evidence in the record with the execution of that note. The burden of proof was upon the plaintiffs in error to establish the charge of fraud laid in their bill. Every transaction is presumed to be fair and honest until the contrary is established. A husband may deal with his wife in business matters and protect her by conveyances in satisfaction of existing indebtedness. So may he protect relatives standing as creditors, if done in good faith. Such relationship is not proof of fraud or that there is no *bona fide* indebtedness. (*Hughes* v. *Noyes,* 171 Ill. 575; *American Hoist*

*Co.* v. *Hall,* 208 id. 597.) Relationship is merely a circumstance that may excite suspicion but will not of itself amount to proof of fraud. *American Hoist Co.* v. *Hall, supra; Merchants' Nat. Bank* v. *Lyon,* 185 Ill. 343.

As a result of the contract and deeds to his wife and brother, William Barber has no property, real or personal, whatever, and owes debts to the amount of more than $3300. The evidence in this record does not account satisfactorily for his insolvent condition. He bought the 120 acres of land in January, 1905, from John Lambert, paying him $7800 therefor,—$1900 cash, the remainder owing by him at five per cent interest. He farmed it two years and sold it to Margaret Mattingly for about $9600. In 1908 he re-purchased it for about the same price for which he sold it, and at that time he had several thousand dollars in money and some sale notes, according to his testimony. According to the testimony of himself, his wife and his brother, he had been a stock trader for many years and continued in that business up until those deeds were made. He was a good trader and made money. They all testified that he was very economical. His wife raised chickens and made considerable money on poultry and furnished entirely the food that went on the table out of her own money. Notwithstanding all this, and the further fact that he sold the land for $110 per acre, or for $13,200,—$5400 more than he originally bought it for,—everything he had is gone, and the evidence does not satisfactorily account for how it got away.

The testimony of James E. and William Barber is also to the effect that James had been farming as a renter prior to the spring of 1903; that in that spring he sold out his farming implements and stock and with his wife went to California and stayed about three months, expecting to live there if it suited him; that William bought part of his stock and implements and gave him a note for $976.68 in payment; that he had besides that note $835, about $435

of which he left with William and for which no note was given, and that that money was to be sent to him by his brother in case he needed it; that he traveled around quite a bit on that trip, and when he returned to Morgan county, in the latter part of July, he had between $400 and $500. His bank account showed that he deposited $200 and checked on it from July 25, 1903, to December 26, 1903, without making any other deposit, on which latter date he had a balance of only $56.40. They further testify that James began to work for William on the latter's farm in the latter part of July 1903, and continued at that work until about March, 1907, and again from the latter part of October, 1908, until the early part of 1914; that during all that time his wages were one dollar per day for the days he worked,—Sundays, rainy days, etc., being excluded; that his wages were practically the sole source of his income, and that his brother paid him only small sums of money occasionally for his work. The $435 which they testified William held for him he took in the fall of 1903 in horses and cows that William sold him. He also paid William for the pasturing of this stock, besides feed he may have bought for them, until they were sold at a sale of stock by William on his farm in the spring of 1907. For that stock James realized $506, according to the testimony. No part of the principal or interest of the $976.68 note held by James against William was ever paid, nor was any part of the principal or interest of a number of other notes held by James against William paid by the latter, in all amounting to $4000, according to their story on the witness stand, until April 14, 1915, at which time they formed the only consideration moving from James for the house and lot deeded to him by William and wife, as heretofore related. Those notes, and the alleged consideration for the giving of them by James to William, are shown in the following tabulation of them:

No. 1, for $976.68, the note of April 21, 1903.

No. 2, for $200, August 1, 1904, for work and interest on note No. 1.

No. 3, for $575, October 6, 1905, "for some money, work and interest on notes Nos. 1 and 2."

No. 4, for $385, March 27, 1906, for work and interest on notes Nos. 1, 2 and 3.

No. 5, for $2171, March 1, 1907, renewal of notes Nos. 1, 2, 3 and 4, including interest.

No. 6, for $281, April 4, 1908, "for interest on No. 5 and some money."

No. 7, for $235, October 16, 1909, for work and interest on note No. 5.

No. 8, for $260, October 27, 1910, for work and interest on former notes.

No. 9, for $227, September 1, 1911, for work and interest on former notes.

No. 10, for $195, September 10, 1912, for interest on former notes.

No. 11, for $335, December 4, 1912, for money the proceeds of stock sold.

No. 12, for $225, September 16, 1913, "mostly for interest—some labor."

No. 13, for $4000, January 1, 1915, for all back notes and interest.

Plaintiffs in error contend that note No. 5 was never written and signed by William Barber until long after its date and that it represented no actual debt and is fictitious, and that all the other notes are either paid or are of the same fictitious character. After a careful study of the evidence we have reached the conclusion that all of said notes had been paid by William to James Barber long before the execution of note No. 13 of January 1, 1915,—at least that portion of them that was genuine,—and that No. 5 and No. 13 were fictitious or given without consideration and for the purpose of aiding William to defeat his creditors. In aid of plaintiffs in error's contention they proved by the bank accounts of William and James E. Barber that William paid to James from May 20, 1907, to September 4, 1907, in five checks, a total sum of $1421; in June and

October, 1908, he paid him $285 in two checks; $700 on December 17, 1909, and in January, 1910, and later, further sums of $166, making in all $2572. They further proved that James himself signed and delivered to William notes for the following amounts on the following dates: March 2, 1908, $465; April 15, 1908, $380; February 3, 1909, $378; February 26, 1909, $243, making a total of $1466. James also drew checks in favor of William for the following amounts on the following dates: July 1, 1908, $187; October 12, 1908, $65; October 8, 1909, $150; November 18, 1909, $7.30; January 7, 1910, $45, making a total of $454.30. The proof also shows positively that note No. 5 given by William to James for $2171 on March 1, 1907, was never executed on the date it bears date. In their first examination both the Barbers, and particularly James, whose attention was specially called to this note as well as to all other notes, positively testified that this note and all the other notes were signed on the identical dates they bore date. Note No. 5 was written on a blank note form that came into existence for the first time July 19, 1909. This fact was clearly and unmistakably proven, as it was written on a form note of the Elliott State Bank, which bank was not known by that name until July 19, 1909. How long after that date that note was executed cannot be definitely told from any evidence except the testimony of William and James. After the foregoing facts were proven by plaintiffs in error William and James were recalled to the witness stand and by way of explanation of note No. 5 they testified that one of the children of James had gotten hold of the original note of which No. 5 was an exact duplicate and tore it into bits in the year 1910, and that was why it bore date of March 1, 1907. We are thoroughly convinced that note No. 5 is not an exact duplicate of any former note. It will be noticed that all notes in the record previous to No. 5 drew seven per cent interest. No. 6, following No. 5, also

draws seven per cent interest. All notes following No. 6, and No. 5, draw six per cent interest. A further examination shows that No. 5 is not for the correct amount of the principal and interest on the notes preceding it by something near $100. The same is true of note No. 13, for $4000, wherein the interest calculation is in error some $200 or more. William was unable to explain satisfactorily these various discrepancies and was unable to give any satisfactory explanation as to why his brother signed notes to him and drew checks in his favor when he was largely indebted to James according to both of their claims. His final answer was: "A person going along through life doing business with lots of people does lots of funny kinds of business that he can't explain just why he don't do this thing or didn't do that."

James Barber, when he was recalled, gave further testimony that was very damaging to his and his brother's case. When he first testified his testimony was very positive that all of the thirteen notes were given to him by his brother on the days they were dated, and that he took possession of them on those very dates. When later recalled, in explanation of why he was giving checks and notes to his brother when his brother owed him and had owed him since 1903, and when he was trying to explain that note No. 5 was a duplicate and issued in the place of a former note of the identical date and amount, he made the following statement: "The reason why that note [No. 5] is the only one that was destroyed [by his child] is, that was the only one that I was holding at that time, in January, 1910. I had given him up all the others. The note dated in 1908 was in my brother's possession at that time, and also the note dated in 1909. They were all in his possession except this note that was torn up, 1907, and that is my best recollection. * * * I think the one signed in 1910 was probably at his house." We cannot harmonize this testimony consistently with the idea that William owed

287 — 13

all thirteen of those notes other than the renewals, or that he owed either one of the renewals. It might happen in dealings between two brothers that they might give to each other mutual checks and notes,—*i. e.,* from one to the other,—without either one giving or taking credit on former notes, but it is absolutely inconsistent with the ordinary business methods of individuals in any kind of business to surrender and turn over all of their notes to the payor and let him continually hold notes that had been previously signed and delivered to the payee. All these notes came from William when they were produced on the trial, and James so testified. In other words, from January, 1910, on up to this trial all the notes were in the possession of William.

There are other circumstances in the record that add weight to the plaintiffs in error's contention that all the notes were paid by William to James Barber long before the deeds in question were made and that some of them are fictitious. One note signed by William Barber to Mrs. Barber was also proved to be fictitious, as it was proven to have been given a year or more before the form note on which it was written had existed,—*i. e.,* if given on the date it bore date. James and William Barber's testimony was substantially different in some particulars when they undertook to go into detail as to what the various notes and checks were given for. It also appears positively from the testimony of James that at the time of the final settlement with his brother, in April, 1914, testified to by them, he only had "a team of mules, some farm implements, and some work harness and a set of driving harness, double set of driving harness, buggy and road cart." He did not own any real estate except the lot William and his wife conveyed to him and had "no large sum" of money in the bank and no one owed him any large amount. While he testified that he bought stock from 1903 until the settlement, he places nearly all of his purchases as made from

his brother or his father, who has long since been dead. At no time has he ever had a farm or home of his own, so far as this record shows.

As we view the matter, the circuit court's conclusion on the evidence and the decree in this case are sustained by the weight of the evidence.

The judgment of the Appellate Court is reversed and the decree of the circuit court is affirmed.

> *Judgment of Appellate Court reversed.*
> *Decree of circuit court affirmed.*